# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-12-00199-CV

Tramel R. Bracey, Appellant

v.

City of Killeen, Texas; and Police Chief Dennis Baldwin, Appellees

FROM THE DISTRICT COURT OF BELL COUNTY, 169TH JUDICIAL DISTRICT
NO. 253,047-C, HONORABLE RICK MORRIS, JUDGE PRESIDING

## O P I N I O N

This appeal presents two sets of issues regarding statutes that govern the employment relationship between Texas police officers and the municipalities they serve. First, we must address the scope of the subject-matter jurisdiction that the Legislature has conferred upon Texas courts to review the decisions of independent hearing examiners under the Civil Service Act.[1] Second, assuming we determine that Texas courts have jurisdiction to reach the question in the context of an appeal from a hearing examiner's decision, we must consider the relationship between (1) the notice-and-hearing requirements applicable to disciplinary suspensions and dismissals under the Civil Service Act,[2] and (2) Subchapter B of Government Code chapter 614, which prohibits "disciplinary action" against a police officer based on a "complaint" unless the "complaint" is

---

[1] *See generally* Tex. Loc. Gov't Code § 143.057.

[2] *See generally id*. §§ 143.051-.053, .057.

reduced to writing, signed, and provided to the officer.[3]  More specifically, we must decide whether

an independent hearing examiner "exceeded her jurisdiction" within the meaning of the Civil Service

Act's judicial-review provisions in upholding a police officer's indefinite suspension (i.e., dismissing

him) when the disciplinary action fully complied with the requirements specified within the

Civil Service Act, yet originated with "complaints" that were not reduced to writing, signed, and

provided to the officer as Subchapter B requires.  Under the circumstances here, we conclude that

the examiner acted within her jurisdiction.

## BACKGROUND

Before turning to the specific dispute underlying this appeal, it is helpful to begin with

a brief overview of the statutory context from which it arose.

### Civil Service Act

In municipalities that have voted to adopt it, the Civil Service Act—nowadays

codified as chapter 143 of the Local Government Code—supplants at-will employment of

police officers with a regime of merit-based, just-cause employment that is intended to "secure

efficient . . . police departments composed of capable personnel who are free from political influence

and who have permanent employment tenure as public servants."[4]  The regime is administered by

a local civil service commission whose duties include promulgating rules that prescribe, within

---

[3]  *See generally* Tex. Gov't Code §§ 614.021-.023.

[4]  *See* Tex. Loc. Gov't Code §§ 143.001(a), .006, .008, .051, .052(b), .053(g), .057(f); *see generally id*. §§ 143.001-.363.  The Civil Service Act also protects fire fighters, but our focus here is limited to its application to police officers.

2

statutory parameters, the acts or conditions that constitute cause for suspending or removing a police officer from employment.[5] Of particular significance to this appeal are the Act's procedures and limitations governing determination of whether such cause exists and the appropriate personnel actions in response, which for purposes of this case are found primarily within subchapter D of chapter 143, titled "Disciplinary Actions."[6]

In relevant part, the Act authorizes the head of a police department to suspend a police officer within his supervision or jurisdiction for "a reasonable period not to exceed 15 calendar days" or "an indefinite period," the latter being "equivalent to dismissal," "for the violation of a civil service rule."[7] Upon suspending an officer, the department head must, within 120 hours of the suspension, file with the municipality's civil service commission a "written statement," also termed a "letter of disciplinary action," "giving the reasons for the suspension," and also "immediately deliver a copy of the statement in person to the suspended . . . police officer."[8] This statement or letter "must point out each civil service rule alleged to have been violated by the

---

[5] *See id*. §§ 143.001(b), .008(c), .051.

[6] *See id*. §§ 143.051-.057. Certain of the provisions within subchapter D exclude municipalities with a population of 1.5 million or more, but there is no dispute that the current population of the municipality at issue here, the City of Killeen, falls under this threshold. We express no opinion as to the extent our analysis might have implications for municipalities not directly governed by subchapter D. *Cf. City of Houston v. Clark*, 197 S.W.3d 314, 317 n.4 (Tex. 2006).

[7] Tex. Loc. Gov't Code § 143.052(b); *see id*. § 143.051.

[8] *Id*. § 143.052(c); *see id*. § 143.057(a) (referring to "the letter of disciplinary action"); *City of DeSoto v. White*, 288 S.W.3d 389, 392-93 & n.3 (Tex. 2009) (observing that the "written statement" referenced in section 143.052 and section 143.057(a)'s "letter of disciplinary action" "appear to refer to the same document").

suspended . . . police officer" and "describe the alleged acts of the person that the department head contends are in violation of the civil service rules," and "[i]t is not sufficient for the department head merely to refer to the provisions of the rules alleged to have been violated."[9] "If the department head does not specifically point out in the written statement the act or acts of the . . . police officer that allegedly violated the civil service rules," the Act mandates that the civil service commission "shall promptly reinstate the person."[10]

In addition to providing such notice regarding the department head's asserted grounds for suspension, the copy of the statement or letter given to the officer must also give notice regarding the officer's rights to appeal the suspension,[11] which we will describe shortly. However, in contrast to the notice requirements regarding the grounds for the suspension, the Act does not prescribe any particular remedy or consequences for failure to provide the required notice of appeal rights.

The department head's suspension of a police officer is subject to appeal through two alternative procedural mechanisms. First, the officer may appeal the suspension—including the "truth of the charge[s] as made" in the department head's written statement, "the legal sufficiency

---

[9] Tex. Loc. Gov't Code § 143.052(e).

[10] *Id*. § 143.052(f).

[11] *See id*. §§ 143.052(d) ("The copy of the written statement [given to the officer] must inform the suspended . . . officer that if the person wants to appeal to the commission, the person must file a written appeal with the commission within 10 days after the date the person receives the copy of the statement."), .057(a) ("In addition to the other notice requirements prescribed by this chapter, . . . the letter of disciplinary action . . . issued to a . . . police officer must state that in an appeal of an indefinite suspension, [or] a suspension . . . the appealing . . . police officer may elect to appeal to an independent third party hearing examiner instead of to the commission. The letter must also state that if the . . . police officer elects to appeal to a hearing examiner, the person waives all rights to appeal to a district court except as provided by Subsection (j).").

of the charge[s]," and the discipline that should be imposed for any rule violations—through an evidentiary hearing before the municipality's civil service commission.[12]  At the hearing, the department head "is restricted to [his or her] original written statement and charges, which may not be amended."[13]  The commission "may consider only the evidence submitted at the hearing"[14] and "shall render a just and fair decision."[15]  The commission has discretion to:  (1) "permanently dismiss[]" the officer from the police department;[16] (2) order a temporary suspension of the officer for a period not to exceed fifteen days;[17] or (3) "restore" the officer to his or her former position—i.e., return to duty without any suspension—with back pay and benefits for the period in which the officer was suspended.[18]  But the commission has discretion to impose dismissal or temporary suspension, as opposed to restoration, "only for violation[s] of civil service rules and only after a finding by the commission of the truth of specific charges against the . . . police officer."[19]

---

[12]  *Id*. §§ 143.010(b), (g), .053.

[13]  *Id*. § 143.053(c).

[14]  *Id*. § 143.010(g); *see also id*. § 143.053(d) ("The commission may deliberate the decision in closed session but may not consider evidence that was not presented at the hearing.").

[15]  *Id*. § 143.010(g).

[16]  *Id*. § 143.053(e)(1).

[17]  *Id.* § 143.053(e)(2), (f); *see City of Waco v. Kelley*, 309 S.W.3d 536, 545-48 (Tex. 2010) (although not made explicit within section 143.053, duration of "temporary suspension" authorized therein is governed by same fifteen-day limit that expressly limits department head's discretion).

[18]  *See* Tex. Loc. Gov't Code § 143.053(e)(3), (f); *Kelley*, 309 S.W.3d at 548-49.

[19]  Tex. Loc. Gov't Code § 143.053(g).

Alternatively, the officer may bring the appeal before an independent hearing examiner,[20] a forum often perceived to present less risk of pro-employer bias than the municipality's civil service commission.[21] The hearing examiner is chosen either by agreement of the officer and department head or through a process of selection from a list of "seven qualified neutral arbitrators" obtained from the American Arbitration Association (AAA) or the Federal Mediation and Conciliation Service (FMCS).[22] Once selected, the examiner "has the same duties and powers as the commission,"[23] including the requirement that he or she hear evidence,[24] and has the same discretion in regard to discipline.[25]

The Act provides a right of further appeal or judicial review in district court, but the scope of that review varies dramatically depending on whether the officer has chosen to proceed before a civil service commission versus an independent hearing examiner. If the officer has opted to appeal to the civil service commission, the Act allows the officer, if "dissatisfied" with the commission's decision, to obtain trial de novo in the district court, and that court is empowered to "grant the appropriate legal and equitable relief necessary to carry out the purposes of [the Act]."[26] In contrast, the Act makes a hearing examiner's decision "final and binding on all parties," and the

---

[20] *See id.* § 143.057.

[21] *See City of Pasadena v. Smith*, 292 S.W.3d 14, 15 & n.8 (Tex. 2009).

[22] Tex. Loc. Gov't Code § 143.057(d).

[23] *Id.* § 143.057(f).

[24] *See Smith*, 292 S.W.3d at 20.

[25] *See Kelley*, 309 S.W.3d at 544-49.

[26] Tex. Loc. Gov't Code § 143.015.

6

officer's election to proceed in that forum is deemed to waive his rights of further appeal, except to the extent of the following limited grant of subject-matter jurisdiction to the district court:

> A district court may hear an appeal of a hearing examiner's award only on the grounds that the arbitration panel [i.e., the hearing examiner[27]] was without jurisdiction or exceeded its jurisdiction or that the order was procured by fraud, collusion, or other unlawful means.[28]

**Subchapter B**

Subchapter B of Government Code chapter 614 imposes regulations—including a type of notice requirement—that apply when certain law enforcement agencies are presented with a "complaint" against one of their officers.[29] Although Subchapter B does not define or elaborate on the nature of a "complaint," a panel of this Court has construed the term to encompass "any allegation of misconduct that could result in disciplinary action," regardless whether the source is external to the law enforcement agency or originates within it.[30]

---

[27] *See Clark*, 197 S.W.3d at 318 n.5 (presuming that reference to "the arbitration panel" within section 143.1016, subsection (j), which applies to municipalities with populations of 1.5 million or more and closely mirrors section 143.057, subsection (j), necessarily refers to the individual hearing examiner who rendered the decision).

[28] Tex. Loc. Gov't Code § 143.057(c), (j); *see also Clark*, 197 S.W.3d at 317-24 & n.4 (holding that municipalities, not just officers, enjoy the Act's limited right to appeal hearing examiner decisions to district court).

[29] *See* Tex. Gov't Code §§ 614.021-.023. Like the Civil Service Act, Subchapter B of chapter 614 also protects fire fighters, but, again, our focus here is on its application to law enforcement officers.

[30] *Treadway v. Holder*, 309 S.W.3d 780, 782-86 (Tex. App.—Austin 2010, pet. denied); *id*. at 786-89 & n.1 (Waldrop, J., dissenting) (although "agree[ing] with the majority that there is no distinction between 'external' complaints relating to an employee and 'internal' complaints—i.e., between complaints generated outside the organization and those generated within the

Within Subchapter B, section 614.022 specifies that in order for a "complaint" "[t]o be considered by the head of a . . . local law enforcement agency," it must be "in writing" and "signed by the person making the complaint."[31] Section 614.023, in turn, requires that "[a] copy of a signed complaint . . . shall be given to the officer or employee within a reasonable time after the complaint is filed,"[32] and that:

> Disciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee.[33]

Section 614.023 further prohibits the indefinite suspension or termination of an officer "based on the subject matter of the complaint unless: (1) the complaint is investigated; and (2) there is evidence to prove the allegation of misconduct."[34]

Prior to September 1, 2005, Subchapter B applied, in pertinent part, to a "complaint" against "a police officer who is not covered by a civil service statute."[35] However, in its regular

---

organization—for purposes of the application of Subchapter B," urging that "complaint" did not include those generated within the officer's own chain of command).

[31] Tex. Gov't Code § 614.022.

[32] *Id*. § 614.023(a).

[33] *Id*. § 614.023(b).

[34] *Id*. § 614.023(c).

[35] Act of May 16, 1969, 61st Leg., R.S., ch. 407, § 1, 1969 Tex. Gen. Laws 1333, 1333-34, *recodified by* Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 1, secs. 614.021-.023, 1993 Tex. Gen. Laws 583, 678-79 (amended 2005) (current version at Tex. Gov't Code §§ 614.021-.023); *see also* *Guthery v. Taylor*, 112 S.W.3d 715, 717 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (observing that pre-2005 versions of "Texas Government Code sections 614.022 and 614.023 . . . apply only to those police officers who are not covered by a civil service statute").

session earlier that year, the Seventy-Ninth Legislature broadened this facet of the statute's coverage to include "a peace officer under Article 2.12, Code of Criminal Procedure, or other law who is appointed or employed by a political subdivision of this state," and excluding only those "appointed or employed by a political subdivision that is covered by a meet and confer or collective bargaining agreement . . . if that agreement includes provisions relating to the investigation of, and disciplinary actions resulting from, a complaint against a peace officer . . . ."[36] Consequently, Subchapter B in its amended form facially extends to at least some law enforcement officers who are covered by the Civil Service Act and who, for that reason, would previously have been explicitly excluded from Subchapter B's coverage. The implications of this change are at the center of this appeal.

**The dispute**

Appellant Tramel Bracey was formerly an officer with the police department of the City of Killeen, appellee. Killeen is among the municipalities that have adopted the Civil Service Act, and it is the Act, not a meet-and-confer or collective-bargaining agreement, that governs its employment relationship with its police officers. There is no dispute that Bracey was fully entitled to the civil-service protections that the Act provides to Killeen police officers,[37] or that he likewise came within the coverage of Subchapter B in its current form as "a peace officer . . . appointed

---

[36] Act of May 19, 2005, 79th Leg., R.S., ch. 507, § 1, sec. 614.021, 2005 Tex. Gen. Laws 1394, 1394 (current version at Tex. Gov't Code §§ 614.021(a)(3), (b)).

[37] *See* Tex. Loc. Gov't Code § 143.003(5) (defining "police officer" covered by the Act).

or employed by a political subdivision" (Killeen) who was not excluded by virtue of a labor agreement.[38]

In December 2010, following an internal investigation, the head of Killeen's police department—Police Chief Dennis Baldwin, appellee—indefinitely suspended Bracey based on his alleged violation of several Killeen civil service rules. In accordance with the Civil Service Act, Chief Baldwin prepared, filed, and delivered to Bracey a letter of disciplinary action detailing the civil service rules that Baldwin contended Bracey had violated and the alleged acts that Baldwin viewed as constituting such violations. To summarize this letter, Baldwin alleged that Bracey had violated the cited rules, some of which incorporated police department general orders and Penal Code provisions, by providing false information when opening two bank accounts,[39] then subsequently being "untruthful" about the underlying events. As factual support for these allegations, Baldwin referenced evidence purportedly compiled during a search of Bracey's home by Killeen Police Detective Charles Dinwiddie[40] and through interviews conducted by an investigator, Captain Jeff Fholer.[41]

---

[38] Tex. Gov't Code § 614.021(a)(3), (b).

[39] Bracey's falsehoods, according to Chief Baldwin, included utilizing his infant son's social security number and an incorrect home address in an attempt to avoid detection by the bank. Bracey's motive, Baldwin suggested, was to avoid having to repay the bank approximately $1,000 he owed for a previous overdraft.

[40] Chief Baldwin stated that Detective Dinwiddie had conducted the search pursuant to a warrant "obtained and executed as a result of an unrelated criminal investigation where[] you [Bracey] were listed as the suspect."

[41] Incidentally, Baldwin's letter also noted that Bracey had been the subject of a separate disciplinary action within the past sixty months that had culminated, according to Baldwin, with a fifteen-day suspension for "neglect of duty."

10

Bracey timely perfected an appeal of his suspension and opted to proceed before an independent hearing examiner rather than Killeen's civil service commission. Before the hearing examiner, Bracey contested both the merits of the allegations against him and, as a threshold matter, whether he was subject to discipline in the first place. While not complaining of any deficiency in the letter of disciplinary action Bracey had provided him under the Civil Service Act or seeking reinstatement on that basis,[42] Bracey insisted that Baldwin had failed to comply with the notice requirements imposed by Subchapter B. More specifically, Bracey urged that the factual allegations originating with the two fellow officers who had investigated his alleged misconduct, Captain Fholer and Detective Dinwiddie, constituted "complaints" that Subchapter B required to be reduced to writing, signed, and provided to him. Because these actions had never been performed, according to Bracey, his suspension violated Subchapter B's proviso that "[d]isciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee."[43] Accordingly, Bracey reasoned, Subchapter B mandated that he be reinstated.

Following the evidentiary hearing, the examiner found that Bracey had violated all of the civil service rules that Chief Baldwin had charged and that "[t]he facts in evidence support the . . . indefinite suspension." The examiner rejected Bracey's arguments regarding Subchapter B, citing *City of Athens v. MacAvoy*,[44] and further observed that Bracey "has had ample opportunity to defend himself and bring forth facts in the investigation for the investigators, the decision makers

---

[42] *See* Tex. Loc. Gov't Code § 143.052(e), (f).

[43] Tex. Gov't Code § 614.023(b).

[44] 353 S.W.3d 905 (Tex. App.—Tyler 2011, pet. denied).

11

and ultimately the hearing examiner to deliberate." We will explore the *MacAvoy* case in detail as it becomes relevant to our analysis, but to summarize its holdings, the Tyler Court of Appeals concluded that while Subchapter B applies to the discipline upheld or imposed by an independent hearing examiner under the Civil Service Act, an examiner nonetheless "exceeded his jurisdiction" under the Act by reinstating an indefinitely suspended police officer on the sole basis that "complaints" required by Subchapter B had not been provided to the officer.[45]

Bracey then appealed the hearing examiner's decision to district court. In attempting to invoke the district court's limited jurisdiction over such appeals, Bracey asserted that the examiner had "exceeded her jurisdiction" by "ignoring" the mandates of Subchapter B and dismissing rather than reinstating him. He prayed that the court sustain his appeal and award him reinstatement with back pay and benefits, plus attorney's fees. Additionally, based on the same underlying allegations, Bracey asserted claims under the Uniform Declaratory Judgments Act[46] against Chief Baldwin, in his official capacity, seeking declarations that Baldwin had violated Subchapter B. Along with his requested declarations, Bracey purported to seek "equitable and mandamus relief" of reinstatement, salary, and benefits, plus attorney's fees.

Appellees answered and filed a motion for final summary judgment on all of Bracey's claims, asserting two related grounds. First, relying primarily on "the holding and reasoning in *City of Athens v. MacAvoy*," appellees argued that the hearing examiner had not

---

[45] *See id.* at 907-11.

[46] *See* Uniform Declaratory Judgments Act (UDJA), Tex Civ. Prac. & Rem. Code §§ 37.001-.011.

"exceeded her jurisdiction" in refusing to reinstate Bracey based on their alleged failure to comply with Subchapter B, but instead had no "jurisdiction" to award him reinstatement on that basis. Second, in what they phrased in terms of an "arbitration and award" defense, appellees argued that the hearing examiner's decision foreclosed Bracey's declaratory claims by resolving the same underlying issue. "Regardless of whether the City violated [Subchapter B]," appellees urged, "[Bracey] received a civil service hearing and presented the appeal of the suspension to the Hearing Examiner."

Bracey responded and also filed a cross-motion for partial summary judgment seeking to establish, as a matter of law, that Subchapter B applied to him; that no written, signed "complaint" from either Dinwiddie or Fholer had ever been provided to him; that this failure violated Subchapter B and triggered the statute's prohibition against "disciplinary action"; and that—joining issue with appellees' motion—the hearing examiner's failure to enforce this prohibition "exceeded her jurisdiction" and rendered the error subject to judicial review and correction. In support of his motion, Bracey presented copies of admissions and deposition testimony from appellees confirming that he came within the coverage of Subchapter B and that no signed, written allegations from either Dinwiddie or Fholer had ever been given to him. Appellees filed a response to Bracey's cross-motion that was substantively an exact duplicate of their own summary-judgment motion.

The district court granted appellees' summary-judgment motion, denied Bracey's competing motion, and rendered final judgment dismissing Bracey's claims with prejudice. It is from this judgment that Bracey appeals.

13

**ANALYSIS**

In two issues, Bracey contends that the district court erred in granting the appellees' summary-judgment motion and denying his cross-motion.

**Standard of review**

We review the district court's summary judgment rulings de novo.[47] Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law.[48] We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor.[49] Under the "traditional" standard for summary judgment—the standard on which both sides have relied—the movant has the initial burden of conclusively negating at least one essential element of a claim or defense on which the non-movant has the burden of proof or conclusively establishing each element of a claim or defense on which the movant has the burden of proof.[50] Once the movant has done so, and only if it does, the burden shifts to the non-movant to produce evidence creating a genuine issue of material fact as to the challenged element or elements in order to defeat the summary judgment.[51]

However, as will become apparent as we proceed with our analysis, the propriety of summary judgment in this case turns principally upon the application of statutory language to

---

[47] *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

[48] Tex. R. Civ. P. 166a(c); *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

[49] *Urena*, 162 S.W.3d at 550.

[50] *See* Tex. R. Civ. P. 166a(c); *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

[51] *See Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

14

undisputed material facts. We review questions of statutory construction de novo.[52] Our primary objective in statutory construction is to give effect to the Legislature's intent.[53] We seek that intent "first and foremost" in the statutory text.[54] We are to consider the statute as a whole, interpreting it to give effect to every part.[55] The words cannot be examined in isolation, but must be informed by the context in which they are used.[56] We assume that when enacting a statute, the Legislature was aware of the background law and acted with reference to it.[57] "Where text is clear, text is determinative" of legislative intent.[58] We give such statutes their plain meaning without resort to rules of construction or extrinsic aids.[59] Only when statutory text is susceptible to more than one reasonable interpretation is it appropriate to look beyond its language for assistance in determining legislative intent.[60]

---

[52] *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006).

[53] *Id*.

[54] *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006).

[55] *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003).

[56] *See TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011).

[57] *See In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012) (orig. proceeding) (quoting *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990)).

[58] *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006); *Shumake*, 199 S.W.3d at 284).

[59] *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635, 637 (Tex. 2010).

[60] *See In re Smith*, 333 S.W.3d 582, 586 (Tex. 2011) (orig. proceeding).

Where, as here, parties assert competing motions for summary judgment on overlapping issues and the trial court grants one motion and denies the other, we consider all of the summary-judgment evidence, determine all questions presented, and, if the trial court erred, render the judgment the trial court should have rendered.[61]

**Appeal of hearing examiner's decision**

As previously noted, the Civil Service Act confers subject-matter jurisdiction on district courts to review hearing examiner decisions only on grounds that the examiner "was without jurisdiction or exceeded [his or her] jurisdiction or that the order was procured by fraud, collusion, or other unlawful means."[62] These grounds likewise define the bases for judicial relief in such an appeal.[63] Bracey's central contentions on appeal, as they were below, are that appellees violated Subchapter B of Government Code chapter 614 by failing to provide him written, signed "complaints" from Detective Dinwiddie and Captain Fholer; that these omissions further triggered Subchapter B's prohibition against "[d]isciplinary action . . . taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee"; and that the hearing examiner's failure or refusal to enforce Subchapter B by reinstating him amounted to conduct "exceeding her jurisdiction" that is susceptible to judicial review and correction under the

---

[61] *Valence Operating Co.*, 164 S.W.3d at 661.

[62] Tex. Loc. Gov't Code § 143.057(j); *cf. Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 172 (Tex. 2004) (recognizing that sovereign immunity generally bars judicial review of administrative decisions unless right of judicial review is provided by statute).

[63] *See, e.g., Clark*, 197 S.W.3d at 324 (discussing "scope of review" under Civil Service Act's provisions governing appeal of hearing examiner's decision).

16

Civil Service Act. Bracey does not assert that the hearing examiner's decision "was procured by fraud, collusion, or other unlawful means" or that the examiner "was without jurisdiction" to decide his appeal of the suspension in the first instance. It is also worth noting that Bracey does not dispute, apart from his contentions in reliance on Subchapter B, that the acts of the hearing examiner were within her "jurisdiction" under the Civil Service Act and that appellees likewise fully complied with the Act's requirements. He does not complain, for example, that Chief Baldwin's letter of suspension failed to give the notice of "the act or acts of the . . . police officer that allegedly violated the civil service rules" mandated by the Act,[64] that he was entitled to reinstatement for that reason,[65] or that the hearing examiner "exceeded her jurisdiction" (apart from his view of Subchapter B's implications) in determining, based on the evidence presented, that Bracey had violated each of the civil service rules Chief Baldwin had charged and that dismissal was the appropriate disciplinary sanction for the misconduct she had found.

In response, appellees bring forward their arguments that the hearing examiner did not "exceed her jurisdiction" in dismissing Bracey regardless of whether they complied with Subchapter B. On appeal, however, appellees further suggest (contrary to *Treadway*[66]) that Subchapter B applies only to "citizen complaints" and that, in any event, they complied with the statute by providing Bracey the required written "complaints" in the form of Chief Baldwin's letter of suspension, a prior "Charging Memorandum signed by his chain of command," and "a

---

[64] Tex. Loc. Gov't Code § 143.052(e), (f).

[65] *See id.* § 143.052(f).

[66] *See Treadway*, 309 S.W.3d at 784.

17

copy of the personnel complaint form which initiated the internal investigation." But, as Bracey emphasizes, appellees did not contest the applicability of Subchapter B in their summary-judgment motion or response, nor that their conduct in regard to Dinwiddie and Fholer's misconduct allegations had triggered the statute's prohibition against "disciplinary action." Rather, appellees' summary-judgment papers effectively presumed—similar to the *MacAvoy* court[67]—that their actions had triggered Subchapter B's prohibition against "disciplinary action," and argued that the hearing examiner did not "exceed her jurisdiction" regardless. It is on the grounds appellees actually presented that the district court's summary-judgment rulings must stand or fall.[68] In other words, the pivotal issue in the posture of this appeal is as Bracey suggests: whether the hearing examiner "exceeded her jurisdiction," as contemplated by the Civil Service Act's judicial-review limitations, by dismissing rather than reinstating Bracey under circumstances where Subchapter B says that "[d]isciplinary action may not be taken."

Analysis of a hearing examiner's "jurisdiction" and whether or when it is "exceeded" is guided by several recent decisions from the Texas Supreme Court. As the high court has observed, the Civil Service Act's limits on judicial review of hearing examiner decisions appear to have been "borrowed" from the Texas Arbitration Act, and "almost identical" language also appears in the Federal Arbitration Act.[69] Consequently, the Civil Service Act could, as with

---

[67]  353 S.W.3d at 907-11.

[68]  *See* Tex. R. Civ. P. 166a(c); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

[69]  *Smith*, 292 S.W.3d at 19, 21; *see* Tex. Civ. Prac. & Rem. Code § 171.088(a)(3)(A); *see also* 9 U.S.C. § 10 (identical language in Federal Arbitration Act).

arbitration awards, potentially insulate from judicial review not only factual errors by a hearing examiner, but a wide range of legal ones as well.[70] In fact, several of our sister courts, taking a cue from arbitration decisions, had previously construed the Act that way.[71] But, in its recent decisions, the Texas Supreme Court expressly disapproved of these cases and the underlying notion that judicial review of hearing examiner decisions works the same way as review of arbitration awards,[72] reasoning that the "jurisdiction" of a Civil Service Act hearing examiner—and thus the range of decisions that are insulated from judicial review—is much narrower than that of the typical arbitrator. The court has pointed to two basic reasons for this.

First, the high court has observed that while arbitrators usually derive their authority from broadly worded contractual agreements, and that these powers are further augmented by legal principles favoring arbitration, "an independent hearing examiner's jurisdiction is created by the Act and comes with significant constraints."[73] These constraints include numerous "deadlines,

---

[70] *See, e.g.*, *East Tex. Salt Water Disposal Co., Inc. v. Werline*, 307 S.W.3d 267, 272 (Tex. 2010) ("Because Texas law favors arbitration, judicial review of an arbitration award is extraordinarily narrow."); *Universal Computer Sys., Inc. v. Dealer Solutions, L.L.C.*, 183 S.W.3d 741, 752 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("Review [of an arbitration award] is so limited that a court may not vacate an arbitration award even if it is based upon a mistake of fact or law.").

[71] *See, e.g.*, *City of Houston v. Clark*, 252 S.W.3d 561, 567 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (concluding that courts "lack jurisdiction to review the merits of the hearing examiner's decision, including issues regarding whether the hearing examiner abused his discretion and ignored or misinterpreted controlling law"); *City of Pasadena v. Smith*, 263 S.W.3d 80, 84-85 (Tex. App.—Houston [1st Dist.] 2006) (holding that trial court lacked jurisdiction to review hearing examiner's decision that erred in applying law), *rev'd*, 292 S.W.3d at 17-22.

[72] *E.g.*, *Smith*, 292 S.W.3d at 21.

[73] *Id.* at 20.

19

procedures, and limitations" under the Act that "both confer[] and limit[] the power of a hearing examiner."[74] Further, the court has concluded, "the Act does not empower a hearing examiner to make rules."[75]

The second distinction emphasized by the supreme court, related to the first, is that the Act's delegation of decision-making authority to a hearing examiner potentially implicates the constitutional limitations on delegations of "legislative" power to private entities, which the court apparently considers hearing examiners to be.[76] A delegation of power by the Legislature without "reasonable standards" to govern its exercise "is an abdication of the authority to set governmental policy which the Constitution assigns to the legislative department," and the risk of such evils is considered to be especially grave when the delegation is made to a private entity as opposed to a public one.[77] Accordingly, private delegations are permissible under the Texas Constitution, to summarize the relevant limitations, only "if the legislative purpose is discernable and there is

---

[74] *Kelley*, 309 S.W.3d at 541-42 (citing *Smith*, 292 S.W.3d at 20).

[75] *Smith*, 292 S.W.3d at 20.

[76] *See id*. at 17-20. As previously noted, a hearing examiner may be chosen by the parties' agreement or through a process of selection from a list of "qualified" and "neutral" arbitrators prepared by either the AAA, a private entity, or the FMCS, which is a federal agency. *See* Tex. Loc. Gov't Code § 143.057(d); *Proctor v. Andrews*, 972 S.W.2d 729, 734 (Tex. 1998) (citing 29 U.S.C. § 171). Although the Texas Supreme Court suggested in *Proctor* that the constitutionality of the Civil Service Act's delegation of power to FMCS to select the list of proposed hearing examiners might be analyzed differently than its delegation of the same power to AAA, *see Proctor*, 972 S.W.2d at 734, the court has not drawn any such distinctions when analyzing the Act's delegation of authority to a hearing examiner, once chosen, to decide the appeal. *See Kelley*, 309 S.W.3d at 541-42; *Smith*, 292 S.W.3d at 17-18.

[77] *Smith*, 292 S.W.3d at 17-18.

protection against the arbitrary exercise of power."[78]  Although the Texas Supreme Court has not

yet definitively addressed whether the Act's delegation of decision-making authority to hearing

examiners comports with these limitations, it has strongly cautioned that the delegation raises

"constitutional concerns" if the Act's provisions that define and constrain hearing examiners'

authority cannot be enforced through "meaningful" judicial review:[79]

> [I]f the Act does not bind hearing examiners to definite standards for reaching decisions and instead gives them broad latitude in determining not only factual disputes but the applicable law, they become not merely independent arbiters but policy makers, which is a legislative function.  This would raise nondelegation concerns . . . .  It is one thing for a hearing examiner to determine whether conduct for which an officer . . . has been disciplined occurred as charged; it is quite another thing for a hearing examiner to decide whether conduct that did occur deserves discipline.  If a city can invoke judicial review to require that a hearing examiner's ruling be made according to law, one concern of the nondelegation doctrine is satisfied.  But . . . "if the right of appeal provided by [the Act] does not afford a city meaningful review of a hearing examiner's decision, . . . delegation of grievance decisions to an independent hearing examiner may raise constitutional problems."[80]

And it follows, in the supreme court's view, that these constitutional concerns must also guide

construction of a hearing examiner's "jurisdiction" as it bears upon whether the Act permits judicial

review of a particular action or decision of the examiner:

---

[78] *Clark*, 197 S.W.3d at 320 (quoting *Proctor*, 972 S.W.2d at 735); *see also Texas Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 472 (Tex. 1997) (prescribing eight-factor test for determining whether private delegation of legislative power exceeds constitutional limitations).

[79] *See Kelley*, 309 S.W.3d at 541-42; *Smith*, 292 S.W.3d at 17-18; *see also Lewellen*, 952 S.W.2d at 472 (identifying susceptibility of private delegate's actions "to meaningful review by a state agency or other branch of state government" as one of the eight factors applied when evaluating constitutionality of private delegation).

[80] *Smith*, 292 S.W.3d at 18-19; *accord Kelley*, 309 S.W.3d at 541-42 (quoting *Smith*, 292 S.W.3d at 18-19).

Thus, in construing the scope of judicial review permitted by [the Act], we must be mindful . . . that "[w]hen faced with multiple constructions of a statute, we must interpret the statutory language in a manner that renders it constitutional if it is possible to do so."[81]

The supreme court has acknowledged that "[i]t is difficult to distill from these statutory and constitutional constraints a simple, precise standard for determining whether a hearing examiner has exceeded his jurisdiction."[82] But in *City of Pasadena v. Smith*, it offered the following as "[t]he most accurate test we can state":

[A] hearing examiner exceeds his jurisdiction when his acts are not authorized by the Act or are contrary to it, or when they invade the policy-setting realm protected by the nondelegation doctrine.[83]

To date, the supreme court's specific applications of these concepts have focused on whether a hearing examiner's acts were "authorized by the Act or . . . contrary to it," as opposed to being consistent with the Act yet nonetheless "invad[ing] the policy-setting realm." In *City of Waco v. Kelley*, the court held that a hearing examiner "exceeded his jurisdiction" in imposing disciplinary remedies the court concluded were not authorized by the Civil Service Act under the circumstances presented—a temporary suspension exceeding fifteen days in duration, a demotion, and back pay to the extent the employee was awarded compensation during a period of suspension.[84] Similarly, in

---

[81] *Smith*, 292 S.W.3d at 19 (quoting *Clark*, 197 S.W.3d at 320).

[82] *Id*. at 21.

[83] *Id*.

[84] 309 S.W.3d at 541-49.

*Smith*, the supreme court held that a hearing examiner had exceeded his jurisdiction in summarily reinstating an indefinitely suspended employee based solely on noncompliance with an Act provision that the examiner erroneously believed to require the department head to personally attend the hearing.[85] The court reasoned that (1) the Act required the hearing examiner to hear evidence and base his decision on it, yet he had refused to hear evidence; (2) in contrast to the Act's provisions requiring immediate reinstatement if the letter of suspension failed to provide adequate notice of the grounds for suspension, nothing in the Act required or authorized reinstatement as the penalty for noncompliance with the provision on which the examiner had relied; and (3) the provision of the Act on which the examiner relied had not applied in the first place.[86]

Also instructive is *City of DeSoto v. White*, in which the court held that a department head's failure to provide the notice regarding appeal rights that the Civil Service Act required to be included with the letter of suspension did not deprive the hearing examiner of his jurisdiction under the Act to proceed with the appeal and impose discipline (i.e., mandate immediate reinstatement), but should be remedied instead by abating the hearing to afford the municipality opportunity to cure the omission.[87] Applying the *Dubai* analysis of whether a statutory notice requirement is "jurisdictional" (i.e., a prerequisite to a tribunal's subject-matter jurisdiction) as opposed to merely mandatory,[88] the *White* court looked to whether the Act evidenced "clear legislative intent" to make

---

[85] 292 S.W.3d at 17-18.

[86] *See id.* at 17-21 & n.47.

[87] 288 S.W.3d at 393-401.

[88] *See Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75-77 (Tex. 2000).

23

the notice requirement a prerequisite for a hearing examiner's "jurisdiction" to hear an appeal and impose discipline, considering the Act's text, "the presence or absence of specific consequences for noncompliance," and the consequences that would result from each alternative construction.[89] To reach its conclusion, the supreme court reasoned that, first, the Act did not expressly make the notice requirement jurisdictional, nor was the requirement made a statutory prerequisite to suit.[90] It next observed that the Act had not specified any particular consequences for noncompliance with the notice requirement, which it found particularly significant when contrasted with the Act's requirement of "prompt[] reinstate[ment]" where the letter of suspension "does not specifically point out . . . the act or acts . . . that allegedly violated the civil service rules . . . ."[91] "By arguing that the City's failure to provide the required notice is jurisdictional," the court emphasized, "White seeks the same remedy provided for in section 143.052(f) [the provision mandating "prompt[] reinstate[ment]" for inadequate notice of charges]—dismissal," and that "'[w]hen the Legislature includes a right or remedy in one part of a code but omits it in another, that may be precisely what the Legislature intended,' and 'we must honor that difference.'"[92] Finally, regarding the "consequences" of holding that the notice requirement was jurisdictional, the court reasoned that reinstating an officer "without an adjudication of the very serious allegations against him," which

---

[89] *See White*, 288 S.W.3d at 393-97 (citing *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 495 (Tex. 2001); *Dubai Petroleum Co.*, 12 S.W.3d at 75-77).

[90] *See id*. at 395-96.

[91] *Id*. at 396 (quoting Tex. Loc. Gov't Code § 143.052(f)).

[92] *Id*. (quoting *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84 (Tex. 2004)).

included abusing sick leave policy and "subsequently l[ying] to a supervisor about his actions . . . cannot be the result the Legislature intended," given "the vital role of police officers . . . in our society, and the need for continued public trust in the exercise of their duties," and "especially where an interpretation which concludes that the provision is not jurisdictional would still protect the officer's appellate rights" through the abatement remedy.[93]

*MacAvoy*—the Tyler Court of Appeals decision on which appellees and the hearing examiner relied—applied the Texas Supreme Court's reasoning from *Smith* and *White* to resolve a dispute, similar to the present one, regarding whether or how a municipality's noncompliance with Subchapter B affects a hearing examiner's authority to impose discipline under the Civil Service Act. MacAvoy, a police officer for the City of Athens, was indefinitely suspended by the police chief pursuant to the Civil Service Act after an internal investigation revealed that he had engaged in sexual relations with a woman while on duty and committed other violations of departmental policy.[94] The investigation had been triggered when the woman's husband had notified the police department of MacAvoy's actions. MacAvoy appealed the suspension to an independent hearing examiner and argued, similar to Bracey here, that Subchapter B barred his suspension and required his reinstatement because he had not been provided a signed, written "complaint" from the woman or her husband.[95] Although the hearing examiner proceeded to hear evidence (a fact distinguishing the case from *Smith*), he ultimately agreed with MacAvoy that Subchapter B barred his discipline

---

[93]  *Id*. at 396-97 & n.6.

[94]  353 S.W.3d at 906.

[95]  *Id*.

25

and, on that sole basis, ordered him reinstated.[96] The City of Athens appealed the hearing examiner's decision to the district court, which granted summary judgment that the examiner had not "exceeded his jurisdiction" in ordering MacAvoy reinstated.[97] Concluding otherwise, the Tyler Court of Appeals reversed.

While conceding that Subchapter B, by its terms, applied to "disciplinary actions" reviewed or imposed by Civil Service Act hearing examiners, the Tyler court found fault with the examiner's reinstatement of the officer on the sole basis that the City had not complied with Subchapter B. In the court's view, this application of Subchapter B made it tantamount to a jurisdictional prerequisite that must be satisfied in order for a hearing examiner to have power to impose discipline under the Civil Service Act.[98] Because hearing examiners have no authority to create procedural rules, per *Smith*, the controlling question, the court reasoned, became whether the Legislature had intended Subchapter B itself to impose this sort of "jurisdictional" limitation on hearing examiners under the Civil Service Act. Following the Texas Supreme Court's analysis in *White*, the Tyler court concluded that Subchapter B was not intended to be this sort of requirement. It observed that while Subchapter B's requirements were clearly mandatory, nothing in that statute purported to make them jurisdictional; that Subchapter B "contains no specific consequences for noncompliance"; and that the consequences of the alternative constructions further suggested that

---

[96]  *Id*. at 906, 910 n.5.

[97]  *Id*.

[98]  *See id*. at 908, 910 n.5.

26

the Legislature had not intended Subchapter B to defeat the jurisdiction of a hearing examiner under

the Civil Service Act:

> If the tendering of a complainant's statement prior to discipline is jurisdictional, a police officer cannot be relieved of duty even for very serious infractions if the statement is not provided prior to the imposition of discipline. On the other hand, if the statement requirement is not jurisdictional, a hearing examiner can hear a case where the officer['s] . . . right to due process is respected even if the statement is presented at a time after the initial discipline is imposed.[99]

In light of these considerations, the Tyler court held that "[i]n the absence of a legislative directive

that the failure to provide a complainant's statement prior to discipline means that the officer will

escape discipline, the hearing examiner exceeded his jurisdiction by crafting such a rule."[100]

Bracey emphasizes that *MacAvoy* is not binding precedent on this Court, and

urges that we should not follow its analysis here. He disputes the Tyler court's assessment that

Subchapter B "contains no specific consequences for noncompliance" that are material to hearing

examiners, insisting that "[*d*]*isciplinary action may not be taken* against the officer" could not be

any clearer in specifying the consequences for failing to give "a copy of the signed complaint . . . to

the officer." But more fundamentally, Bracey asserts that *MacAvoy* asked and answered the wrong

question. What *MacAvoy* addressed, Bracey suggests, is whether compliance with Subchapter B

affects the "jurisdiction" of a hearing examiner only in the sense of whether "his acts are not

authorized by the [Civil Service] Act or are contrary to it"—i.e., the first two components of the

---

[99] *Id*. at 909-10 (footnote omitted).

[100] *See id*. at 910 (citing *Smith*, 292 S.W.3d at 21, for proposition that "a hearing examiner exceeds his jurisdiction when his acts are not authorized by the Act or are contrary to it").

"test" the Texas Supreme Court announced in *Smith*.[101] In fact, Bracey goes as far as to concede that, at least in this sense, "[appellees'] failure to comply with Subchapter B did not cause the hearing examiner to be without jurisdiction." But the real question presented in cases like these, Bracey reasons, instead concerns the third component of the *Smith* test—whether the hearing examiner, even if otherwise acting consistently with the Civil Service Act, nonetheless "exceeded his jurisdiction" through acts that "invade the policy-setting realm protected by the nondelegation doctrine."[102] Specifically, Bracey contends that Subchapter B embodies the Legislature's intent and policy judgment that failure to provide a police officer a written "complaint" as required under Subchapter B is of sufficient gravity to preclude "disciplinary action," including that reviewed or imposed by hearing examiners in appeals under the Civil Service Act, and require reinstatement. By failing to give effect to Subchapter B, Bracey insists, the hearing examiner supplanted the Legislature's policy judgments with her own.

Appellees counter in part that even if the hearing examiner somehow failed to construe or apply Subchapter B properly, that error would be insulated from judicial review because it would not implicate the examiner's "jurisdiction" as contemplated by the Civil Service Act. They reason that the Act empowers hearing examiners to construe and apply statutes like Subchapter B in the course of deciding disciplinary appeals, that hearing examiner decisions are "final and binding on all parties" so long as the examiner remains within this "jurisdiction," and that "getting it wrong" is not the same as lacking jurisdiction to decide a question in the first place. We disagree

---

[101] 292 S.W.3d at 21 ("a hearing examiner exceeds his jurisdiction when his acts are not authorized by the Act or are contrary to it").

[102] *Id.*

with appellees that the Act permits or requires courts to ignore the question of Subchapter B's implications for and effects on a hearing examiner's authority.

While the Texas Supreme Court continues to recognize that "'[a]sserting that a decision made by a hearing examiner is incorrect is not the same as asserting that the hearing examiner did not have jurisdiction,'"[103] the reasoning of its recent decisions guides us to classify the error of which Bracey complains as going to the examiner's "jurisdiction" and not just the merits of her decision. If, as Bracey argues, the Legislature intended Subchapter B's prohibition against "disciplinary action," once activated, to require Civil Service Act hearing examiners to reinstate a suspended police officer regardless of whether discipline would otherwise be authorized under the Act, a hearing examiner's disregard of that prohibition (or even the existence of delegated power to do so) would, if unchecked by "meaningful judicial review," represent the sort of "broad latitude in determining not only factual disputes but the applicable law" and "whether conduct that did occur deserves discipline" that the supreme court considers to imperil the constitutional validity of the Act's delegation of decision-making authority to hearing examiners under the nondelegation doctrine.[104] Whether viewed as "policymaking" (as Bracey characterizes it) or in terms of an external statutory limitation on the disciplinary authority that a hearing examiner would otherwise possess under the Civil Service Act (as the *MacAvoy* court analyzed it), the hearing examiner's failure to give effect to Subchapter B would "exceed her jurisdiction," construed in light of these "constitutional concerns." It follows that the district court had subject-matter jurisdiction to

---

[103] *Id.* (quoting *Smith*, 263 S.W.3d at 85).

[104] *Id*. at 19-20.

determine—and necessarily had to determine—whether Subchapter B actually had this intent and effect in order to decide whether the hearing examiner's decision "exceeded her jurisdiction."[105] In contending that the Act instead bars further judicial inquiry about Subchapter B's proper construction and effect, appellees rely—tellingly—on court of appeals' decisions that were explicitly disapproved by the Texas Supreme Court in *Smith*.[106]

As for whether Subchapter B required the hearing examiner to reinstate Bracey, appellees again rely heavily on *MacAvoy*. Notwithstanding Bracey's attempts to distinguish the case, we find several facets of its analysis instructive and persuasive. Whether viewed in terms of the *White* and *Dubai* analysis of "jurisdictional" requirements or whether hearing examiners are "policymaking" in lieu of following the governing law, the gravamen of *MacAvoy* is that even if the "disciplinary actions" prohibited under Subchapter B include the discipline reviewed or imposed by Civil Service Act hearing examiners, neither Subchapter B nor the Act reflects legislative intent to mandate automatic reinstatement as the sole remedy hearing examiners can impose (per the *White* analysis) and that, in the absence of such a mandate in the statute, hearing examiners actually *lack* jurisdiction to impose reinstatement as an automatic or categorical remedy (per *Smith*). In effect, the *MacAvoy* court reconciled what were potentially conflicting statutory commands—"thou shalt not impose 'disciplinary action,'" sayeth Subchapter B, while the Civil Service Act, at least as construed

---

[105]  *See Harris Cnty. v. Sykes*, 136 S.W.3d 635, 642 (Tex. 2004) (noting "courts always have jurisdiction to determine their own subject-matter jurisdiction" (citing *Camacho v. Samaniego*, 831 S.W.2d 804, 809 (Tex. 1992))).

[106]  *See City of Laredo v. Leal*, 161 S.W.3d 558, 563 (Tex. App.—San Antonio 2004, pet. denied); *Nuchia v. Tippy*, 973 S.W.2d 782, 786 (Tex. App.—Tyler 1998, no pet.); *see also Smith*, 292 S.W.3d at 21 & nn.49 & 50 (noting that cited opinions failed to "accurately restate[] the restrictions on a hearing examiner's authority").

30

in *Smith*, seems to forbid the converse, automatic reinstatement—by construing the statutes collectively to mean that hearing examiners are bound to enforce Subchapter B, but through some remedy other than automatic reinstatement, presumably some form of abatement or other opportunity to cure the notice defect, as in *White*. We agree with this view of the relationship between Subchapter B and the Civil Service Act.

On one hand, Bracey unquestionably comes within the class of law enforcement officers who are now protected by Subchapter B, and assuming (as we must in the posture of this appeal) that appellees failed to provide him a written "complaint" as the statute required, Subchapter B states unambiguously that "[d]isciplinary action may not be taken" against him "unless a copy of the signed complaint is given to [him]." Yet nothing in either Subchapter B nor the Civil Service Act states that automatic reinstatement is the sole remedy or means by which this prohibition can be enforced. The absence of such language stands in contrast to the Act's explicit requirement of "prompt[] reinstate[ment]" if the letter of suspension "does not specifically point out . . . the act or acts . . .that allegedly violated the civil service rules."[107] Such distinctions in the rights and remedies available in those situations, as the Texas Supreme Court emphasized in *White*, "'may be precisely what the Legislature intended'"—"and 'we must honor that difference.'"[108] The supreme court emphasized a similar distinction in *Smith*, pointing out that the statutory provision on which the hearing examiner had erroneously relied in reinstating an employee based on the failure of the department head to attend the hearing did "not authorize rendition of a default judgment as

---

[107] Tex. Loc. Gov't Code § 143.052(f).

[108] 288 S.W.3d at 396 (quoting *PPG Indus., Inc.*, 146 S.W.3d at 84).

31

an automatic penalty for noncompliance" and relying in part on the absence of such an authorization in holding that the hearing examiner "exceeded his jurisdiction" in imposing such a remedy.[109]

Informed by *Smith* and *White*, we conclude, as did the *MacAvoy* court, that the hearing examiner would have "exceeded her jurisdiction" had she reinstated Bracey based solely on appellees' failure to comply with Subchapter B.[110]

Bracey's sole complaint is that the hearing examiner "exceeded her jurisdiction" by failing to reinstate him based on Subchapter B. We have concluded that, to the contrary, the examiner had no jurisdiction to award him that remedy based solely on any failure by appellees to provide him one or more written "complaints" required by Subchapter B. Bracey has not preserved any complaint that the hearing examiner failed to enforce Subchapter B through a remedy that would be within her jurisdiction to award. Accordingly, the hearing examiner did not "exceed her jurisdiction" as a matter of law.[111] The district court did not err in granting appellees' summary-

---

[109] 292 S.W.3d at 20.

[110] In the alternative, if Subchapter B and the Civil Service Act cannot be reconciled in this manner, then we would hold that the Act's provisions defining and limiting the hearing examiner's "jurisdiction" would control under the principle that a specific statute will ordinarily prevail over a general statute when the two cannot be reconciled. *See, e.g.*, *City of Waco v. Lopez*, 259 S.W.3d 147, 153-54 (Tex. 2008) (holding specific statutory scheme in Human Rights Act provided exclusive remedy to aggrieved employee and controlled over more general procedures and remedies in Whistleblower Act).

[111] We express no opinion as to whether appellees' provision of the letter of suspension to Bracey—which, as the hearing examiner suggested, would seem to contain substantively the same information regarding Dinwiddie and Fholer's allegations against Bracey that would have been provided in the signed, written "complaints" Bracey demands, if not more—sufficed to cure any violation of Subchapter B. Certainly the safer approach for employers in appellees' position would be to provide the information in the form of the signed, written "complaints" described in Subchapter B.

judgment motion or denying Bracey's motion as to Bracey's appeal of the hearing examiner's decision.

**Declaratory-judgment claims**

Bracey next argues that the district court erred in granting summary judgment as to his declaratory-judgment claims. He principally argues that the ground on which appellees relied, which was framed in terms of "arbitration and award," is inapposite because proceedings before independent hearing examiners under the Civil Service Act are not, strictly speaking, arbitration.[112] Whatever the merits of this conceptual distinction, the hearing examiner's decision, which we have now concluded was properly upheld by the district court on summary judgment, gives rise to a more fundamental—and jurisdictional—barrier to Bracey's declaratory claims.[113]

In the absence of an applicable waiver of governmental immunity, Bracey can seek to enforce Subchapter B solely through the ultra-vires exception to sovereign and governmental immunity.[114] Bracey's declaratory-judgment claims against Chief Baldwin, in his

---

[112]   *See City of League City v. Blevins*, 821 S.W.2d 212, 215 (Tex. App.—Houston [14th Dist.] 1991, no writ) (holding "proceedings held before an independent third party hearing examiner pursuant to [the Civil Service Act] are not in the nature of an arbitration and are not subject to the provisions of the Texas General Arbitration Act").

[113]   Even if not squarely raised by appellees, we have the power and duty to consider these jurisdictional concerns sua sponte. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95-96 (Tex. 2012); *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

[114]   *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 656 & n.2 (Tex. 2008) (noting that "governmental immunity protects subdivisions of the State, including municipalities" from lawsuits and liability for money damages); *cf. Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 620-21 (Tex. 2011) (per curiam) (noting that sovereign immunity provides similar protection to suits against the state); *Texas A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007) (sovereign immunity generally extends to Texas state officials who are sued in their official

33

official capacity, would be in the nature of such a claim: he seeks to compel the City of Killeen, through Chief Baldwin, to enforce what Bracey contends is a mandatory statutory prohibition against "disciplinary action."[115] Further, as Bracey points out, some of our sister courts, albeit in cases not involving the Civil Service Act, have granted declaratory and injunctive relief to compel reinstatement of police officers based on Subchapter B violations.[116] But as the Texas Supreme Court has more recently made clear in *City of El Paso v. Heinrich*, the sole relief that Bracey could obtain through the ultra vires exception would be declaratory or injunctive relief to compel prospective compliance with Subchapter B—i.e., to reinstate him going forward from the time of judgment—and governmental immunity would continue to bar any retrospective relief, such as retroactive reinstatement and back pay.[117] And while governmental immunity would not bar Bracey's claim for prospective reinstatement, the hearing examiner's decision renders that claim moot—whatever the theoretical merits of Bracey's declaratory claim, it remains that Bracey would still be dismissed from the Killeen Police Department by virtue of a hearing examiner decision that

capacities because that is merely "'another way of pleading an action against the entity of which [the official] is an agent'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))). Although the UDJA provides limited waivers of immunity, Bracey's claims regarding violations of Subchapter B fall outside of them. *See Sefzik*, 355 S.W.3d at 620-22.

[115] *See id*. at 620-21 & n.2 (observing that claims that sought "to compel a government official . . . to perform some act that [the plaintiff] considers to be nondiscretionary" distinguished them as "within the ultra vires rationale").

[116] *See Guthery*, 112 S.W.3d at 724 (rendering judgment that city and police chief violated Subchapter B by failing to provide copies of signed "complaints" and ordering reinstatement of disciplined officer with back pay and benefits).

[117] 284 S.W.3d 366, 373-77 (Tex. 2009).

he cannot overturn.[118]  Bracey's declaratory-judgment claim, in other words, seeks no relief that the district court has subject-matter jurisdiction to award, and the district court properly dismissed it.[119]

## CONCLUSION

We affirm the district court's judgment dismissing Bracey's claims.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed:   November 6, 2013

_____

[118]  *See Klein v. Hernandez*, 315 S.W.3d 1, 3 (Tex. 2010) ("Appellate courts are prohibited from deciding moot controversies because the separation-of-powers article prohibits advisory opinions on abstract questions of law." (citing Tex. Const. art. II, § 1; *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 164 (Tex. 2004))).

[119]  In urging that the hearing examiner's decision should not be deemed to foreclose his declaratory claims, Bracey refers us to a Dallas Court of Appeals decision involving a similar declaratory judgment claim alleging that the City of Dallas had violated Subchapter B and disciplined an employee in spite of it.  *Nelson v. City of Dallas*, 278 S.W.3d 90, 92 (Tex. App.—Dallas 2009, pet. denied).  The *Nelson* court held that an administrative tribunal under Dallas's civil service system had primary jurisdiction to decide whether the city had violated and erroneously applied Subchapter B and, accordingly, that the declaratory claim should be abated pending the administrative process.  *See id*. at 98 ("Even if the City erroneously applies [Subchapter B], that error can be addressed in the administrative process and ultimately in the courts under the judicial review provided by the City charter and ordinances.").  The gist of Bracey's complaint is that the Civil Service Act and *Nelson* collectively force him unfairly into an administrative process that deprives him of any remedy for appellees' violations of Subchapter B.  If that is so, it is a function of the disciplinary procedures that the Legislature has provided in the Civil Service Act, which we are bound to enforce.  Consequently, Bracey's remedy for this perceived flaw in the Act would lie with that branch of government, not the courts.