ACCEPTED
15-25-00194-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
1/1/2026 4:20 PM
CHRISTOPHER A. PRINE
CLERK

# IN THE FIFTEENTH COURT OF APPEALS OF TEXAS
## AT AUSTIN

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
1/1/2026 4:20:41 PM
CHRISTOPHER A. PRINE
Clerk

NO. 15-25-00194-CV

MELISSA RAE DARVELL,
Appellant-Applicant

v.

CAMERON HOOKER PUMPHREY,
Appellee- Respondent

APPEAL FROM THE COUNTY COURT AT LAW THREE
WILLIAMSON COUNTY

APPELLANT'S ORIGINAL BRIEF

GODDARD & HOING, P.C.

By: /s/ Lisa Rasmussen Hoing

Lisa Rasmussen Hoing
1801 Williams Drive
Georgetown, Texas 78628
512.863.2813 (Tel)
512.582.8608 (Fax)
TX SBN 24061028
Attorney for Appellant-Applicant

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................... iii

STATEMENT OF THE CASE ......................................................................................1

ISSUES PRESENTED ..................................................................................................1

STATEMENT OF JURISDICTION .............................................................................2

STATEMENT OF FACTS.............................................................................................2

    *Background and Parties* ......................................................................................... 2

    *Procedural Posture* ................................................................................................ 3

    *January 23, 2025 Protective Order Hearing* ........................................................ 4

    *June 11, 2025 Protective Order Hearing* ............................................................. 8

        Testimony of Appellant...................................................................................... 10

        Testimony of Child Protective Services Investigator ....................................... 12

    *July 2, 2025 Protective Order Hearing* .............................................................. 13

        Testimony of Appellee ...................................................................................... 14

        Testimony of Law Enforcement......................................................................... 15

        Testimony of Sexual Assault Nurse Examiner................................................... 16

*Findings* .............................................................................................. 17

SUMMARY OF THE ARGUMENT ...................................................................18

ARGUMENT ...........................................................................................21

I.    THE TRIAL COURT MISAPPLIED CHAPTER 7B BY ELEVATING
THE STATUTORY STANDARD AND IMPROPERLY RELYING ON A
CRIMINAL GRAND JURY NO-BILL.............................................................. 21

   *Standard of Review and Statutory Framework* ................................................. 21

   *Application to the Record* ......................................................................... 22

II.   THE TRIAL COURT VIOLATED APPELLANT'S RIGHT TO DUE
PROCESS BY DENYING A MEANINGFUL OPPORTUNITY TO PRESENT
EVIDENCE................................................................................................ 25

   *Standard of Review* ................................................................................ 25

   *Applicable Law* ..................................................................................... 25

   *Application to the Record* ......................................................................... 26

REQUESTED RELIEF ...................................................................................28

PRAYER ....................................................................................................29

# TABLE OF AUTHORITIES

*Cases*

*Bracey v. City of Killeen*, 417 S.W.3d 94 (Tex. App.—Austin 2013, no pet.) ...... 21
*Caldwell v. State ex rel. Zimmerman*, No. 03-22-00464-CV, 2024 Tex. App.
    LEXIS 6208, at \*15–16 (Tex. App.—Austin Aug. 23, 2024, pet. denied) ........ 22
*Goldstein v. Sabatino*, 690 S.W.3d 287 (Tex. 2024) ............................................... 22
*In re B.L.D.*, 113 S.W.3d 340 (Tex. 2003) ...................................................... 25, 28
*In re J.F.C.*, 96 S.W.3d 256, 274 (Tex. 2002) ................................................. 25, 28
*In re K.M.L.*, 443 S.W.3d (Tex. 2014) ................................................................. 25
*In re M.S.*, 115 S.W.3d 534 (Tex. 2003) ......................................................... 25, 28
*In re Oates*, 104 S.W.3d 571 (Tex. App.—El Paso 2003, no pet.) ........................ 21
*Mathews v. Eldridge*, 424 U.S. 319 (1976) .......................................................... 25
*State v. Gonzalez*, 82 S.W.3d 322 (Tex. 2002) ..................................................... 25
*Walker v. Packer*, 827 S.W.2d 833 (Tex. 1992) ............................................. 21, 24


*Statutes*

Tex. Code Crim. Proc. art. 7B ........................................................................ *passim*
Texas Gov't Code § 22.220 ..................................................................................... 5

## STATEMENT OF THE CASE

This is an appeal from an order denying an application for a protective order under §. The application sought protection based on allegations of sexual conduct that qualified for protection under Chapter 7B of the Code of Criminal Procedure.

The trial court conducted hearings in Cause 25-0004-POC3 on January 23, 2025, June 11, 2025, and July 2, 2025, in the County Court at Law Number Three of Williamson County, Texas before the Honorable Doug Arnold. Upon the close of evidence, the trial court denied Appellant's requested protective order.

## ISSUES PRESENTED

1. Whether the trial court committed reversible legal error by misapplying Chapter 7B of the Texas Code of Criminal Procedure when it denied Appellant's application for protective order after elevating the statutory "reasonable grounds to believe" standard beyond that required by law and improperly weighing the burden of a criminal grand jury no-bill—contrary to controlling authority dictating that criminal charging decisions do not govern or preclude civil protective-order relief.

2. Whether the trial court violated Appellant's right to due process by denying her a meaningful opportunity to present evidence in support of her application for protective order before making substantive rulings affecting child safety and

1

possession and access, despite Appellant's repeated requests to proceed on the evidentiary merits of her application.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal pursuant to Texas Government Code § 22.220(a) because the appeal is taken from a final order of a county court at law located within the Fifteenth Court of Appeals District. The trial court's order denying Appellant's application for protective order is a final appealable order and Appellant timely perfected this appeal in accordance with the Texas Rules of Appellate Procedure.

## STATEMENT OF FACTS

### *Background and Parties*

On May 21, 2021, a final decree of divorce was entered upon the dissolution of the marriage of Appellant and Appellee. CR 8-9, 19. The decree included a parenting plan setting forth a standard possession order regarding J.A.P. and R.L.P. CR 20-33. Appellant had the right of residency of the children. CR 24. After entry of the decree, Appellee moved to Florida where he resided with his current wife, Kardigan Pumphrey. RR 3:53; RR 4:8-9.

Appellee travelled from Florida to Texas to exercise his rights of possession and access with J.A.P. and R.L.P. RR 4:10. Appellee exercised his visitation at the

Sleep Inn Hotel in Round Rock, Texas and the Comfort Inn Hotel in Pflugerville, Texas. RR 4:10.

Prior to January 6, 2025, the parties and their respective spouses maintained a cooperative co-parenting relationship. RR 3:51-52. They communicated through group text messages, jointly participated in school and birthday events, and coordinated travel and visitation. RR 3:51-53.

On January 6, 2025, J.A.P. made an outcry to Appellant about sexual abuse during her bath. RR 3:53-54. During the bath, Appellant was explaining to J.A.P. and R.L.P. that boys and girls having different types of "pee-pee's." RR 3:54. J.A.P. was six years old and R.L.P. was four years old. CR 20. J.A.P. described occurrences of sexual abuse at the hands Appellee. RR 3:54. Appellant reported J.A.P.'s outcry to law enforcement and Child Protective Services. RR 3:61-62. On January 9, 2025, Appellant, acting in a pro se capacity, filed an application for protective order on behalf of J.A.P. and R.L.P. against Appellee. CR 8.

### *Procedural Posture*

This appeal arises from the denial of an application for protective order filed by Melissa Rae Darvell (hereinafter, "Appellant") against Cameron Hooker Pumphrey (hereinafter, "Appellee") in the County Court at Law Number Three of Williamson County, Texas on behalf of her children, J.A.P. and R.L.P.

*January 23, 2025 Protective Order Hearing*

On January 23, 2025, the trial court conducted a hearing on Appellant's application. RR 2:4. The trial court inquired whether there was a continuing investigation of the outcry. RR 2:4. Appellant confirmed there was a criminal and a Child Protective Services (hereinafter, "CPS") investigation pending. RR 2:4.

The trial court advised Appellant, "So, typically, we let these investigations play out before we proceed with a protective order because one could interfere with the other. Does that make sense?" RR 2:4. Appellant advised the trial court that CPS and the county attorney's office advised her to go to the hearing for the protective order because she could obtain relief sooner than waiting on the county attorney's office. RR 2:5. The trial court asked Appellant, "So, what evidence do you have to support the allegations?" RR 2:5. Appellant advised a forensic interview, a medical interview, and interviews with law enforcement and CPS had occurred. RR 2:6. Appellant advised she had a drawing her child made and video evidence that was not within her possession. RR 2:6. The trial court responded, "So, you're not really prepared to go forward on the merits today, is that right?" RR 2:6. Appellant attempted to respond. RR 2:6. The trial court asked whether Appellee had been served. RR 2:6. Appellant responded there were two failed attempts. RR 2:6. The trial court advised Appellant the hearing couldn't go forward unless Appellee had been served and questioned whether Appellant

4

wanted to "press forward at this time" in light of an ongoing investigation because any evidence introduced at a protective order hearing could interfere with the criminal investigation. RR 2:6. The trial court advised Appellant it is customary for the protective order to issue after the investigation is complete. RR 2:7. Appellant expressed concerns that Appellee still had possession and access rights to J.A.P. and R.L.P. and she was frightened he could take them from school. RR 2:7. The trial court stated it couldn't give Appellant legal advice, RR 2:7, but that it did not want to "move forward" because it could interfere with the criminal investigation. RR 2:8. Upon determining the county attorney had not "taken the case up," the trial court stated, "So, if they're waiting, does that tell you something about this case? That maybe it's premature to go forward on the merits?" RR 2:8.

The trial court continued with the following exchange:

Court:      So, we can just let this kind of sit until there's movement on the criminal case or the county attorney picks it up.

Appellant:  Okay.

Court:      It won't prejudice you in any way. It won't hurt your chances in the long run.

Appellant:  Okay.

Court:      If you move forward and there's not enough evidence, then I might have to deny it. That could be a problem.

Appellant:  Okay. I do –

5

Court:      See, in other words, the county attorney knows what evidence to present. They're well-versed in all that. It sounds like you just have a few things here today. You're not really fully ready to go with the full evidence.

Appellant:  Okay.

Court:      Because it hasn't been developed yet. Does that make sense?

Appellant:  Yes.

Court:      So, perhaps what we should do is let this sit for the time being, let the criminal investigation, let CPS move forward, let the county attorneys decide if they're going to pick it up, and then if there's been an arrest, if the county attorneys have picked it up, you've got a lot more momentum.

Appellant:  Okay.

Court:      Does that make sense?

Appellant:  Yes, Your Honor.

Court:      So, we might just let it ride for now.

Appellant:  Okay…

Court:      … when there's movement, meaning there's been an arrest, or if the county attorneys pick it up, we'll hear it from them.

Appellant:  Okay.

Court:      But it might be a little premature to go forward today. First of all, you haven't served him, so I can't really go forward.

Appellant:  Okay.

Court:      But even if you had, there are things that haven't been developed yet.

Appellant:   Okay.

Court:   Does that make sense?

Appellant:   Yes, Your Honor.

Court:   So, we're not going to hear anything today. If you want to work on serving him, you can, but it sounds like these wheels just grind somewhat slowly, but it takes time for the investigation to get going and for things to play out.

Appellant:   Okay.

Court:   So, I'm not going to make any decision today either way.

Appellant:   Okay.

Court:   We're going to let things happen with CPS and with law enforcement.

Appellant:   Okay.

Court:   Right?

Appellant:   Yes.

Court:   And if the county attorneys pick up it, then they'll come see me, and we'll get another setting.

Appellant:   Okay. RR 2:8-11.

The trial court did not grant or deny Appellant's Application for Protective Order. RR 3:15.

On May 12, 2025, Appellant, represented by counsel, filed a first-amended application for protective order requesting relief in the form of a temporary ex

7

parte order and a final protective order. CR 64-71. The trial court did not grant or deny relief on Appellant's May 12, 2025 request for a temporary ex parte order, nor did it grant it. RR 3:15.

### *June 11, 2025 Protective Order Hearing*

On June 11, 2025, the trial court conducted the second hearing on Appellant's application for protective order. RR 3:4. The trial court announced it was set for Appellant's Application for Protective Order and a hearing on Appellant's petition to modify.[1] RR 3:4. Appellant requested that the trial court proceed on the protective order first. RR 3:4. The trial court requested a proposed order from Appellant. RR 3:4. Appellant advised the proposed order had been filed. RR 3:4. The trial court refused to hear evidence unless it had a physical copy of the proposed order. RR 3:5. The trial court advised it would take up Appellant's motion for temporary orders on the modification petition instead. RR 3:5.

During Appellant's opening statement on the temporary orders, the trial court questioned Appellant about evidence, and made findings concerning: 1) facts not yet offered or received into evidence; 2) the number and identity of permissible outcry witnesses; 3) the role and admissibility of testimony from the Williamson County Children's Advocacy Center (hereinafter, "CAC"); 4) CPS witnesses, and

---

[1] Appellant had also filed a Petition for Modification of the parties' 2021 Divorce Decree in Cause 21-0460-FC3.

5) the relevance of law-enforcement testimony, despite no objections raised and no evidence offered or admitted. RR 3:7–10, 14–15.

Additionally, the trial court made several references to the grand jury and its actions on the criminal case:

- "And that was the accusation that was no-billed by the grand jury?" RR 3:10.

- "You're looking at this broader than what was presented with grand jury; is that what you're saying?" RR 3:11.

- "Was there another charge involving the video that was presented to the grand jury?" RR 3:16.

- "Sure, but that wasn't a discrete charge no-billed by the grand jury. That's the point I was trying to make earlier." RR 3:16.

- "Ok. So, I've got a case that was no-billed by a grand jury, presented to a grand jury and no-billed. Tell me why I shouldn't allow him to have supervised access?" RR 3:23.

The trial court suggested the appointment of an amicus attorney and explained how the appointment would assist the trial court prior to making a definitive ruling regarding Appellee's contact with the children. RR 3:18-19. The parties agreed to the appointment of an amicus. RR 3:18-19.

Appellee requested interim visitation. RR 3:20. Appellant objected and requested that the trial court allow her to present evidence before ruling on Appellee's request for interim possession and access. RR 3:23. After denying Appellant the ability to offer evidence, the trial court ordered supervised contact

9

between Appellee and R.L.P. RR 3:23. Appellant renewed her request that the trial court hear evidence prior to making its finding granting interim supervised visitation of R.L.P. RR 3:25. The trial court denied Appellant's request. RR 3:26. Appellant renewed her request to adduce evidence. RR 3:27. The trial court denied Appellant's request. RR 3:27. Appellant renewed her request to adduce evidence. RR 3:29. The trial court denied her request. RR 3:30.

Appellant requested that the trial court take up the protection order hearing. RR 3:38. The trial court asked Appellant, "Are you sure you want to go forward on this now… the timing seems pretty significant here?" RR 3:40. Appellant advised the trial court she desired to move forward with the protection order hearing. RR 3:40. The trial court characterized Appellant's request for a lifetime protective order as a de facto termination of parental rights. RR 3:45-46.

Testimony of Appellant

Appellant testified that on January 6, 2025, she was giving J.A.P. and R.L.P. a bath while discussing the fact that boys and girls have different "pee-pees." RR 3:50. J.A.P. was six years old and R.L.P. was four years old. RR 3:49. J.A.P. announced she had seen a boy's "pee-pee" because she slept in bed with her daddy who didn't wear undies. RR 3:53-55. J.A.P. told Appellant she touched her daddy's "pee-pee" on multiple occasions using her hands and her feet, RR 3:55, and that her daddy told her, "That feels good." RR 3:56.

J.A.P. told Appellant her daddy played tickle monster with her wearing only a shirt and no "undies." RR 3:61. J.A.P. told Appellant she and her daddy watched videos of people drinking milk out of "pee-pees" when they were in bed. RR 3:56. J.A.P. said her daddy took her into the hotel bathroom, removed her pants and her panties, rubbed her "pee-pee," and told her it was their secret. RR 3:56. J.A.P. told Appellant she watched videos of little boys and little girls touching their daddy's "pee-pee" and drinking milk out of their daddy's "pee-pee" on the computer. RR 3:57-58. J.A.P. told Appellant her daddy told her he wanted her to drink his "pee-pee" like they do in the videos. RR 3:59. J.A.P. told Appellant her daddy touched her and she drank her daddy's "pee-pee" in the bathroom. RR 3:58. J.A.P. told Appellant that, if she didn't do the "private stuff," her daddy would ground her from her toys and Nintendo Switch and pointed to her vagina. RR 3:59, 70. J.A.P. told Appellant her daddy told her that if she didn't do it this time, she would have to do it next time. RR 3:59. J.A.P. told Appellant her daddy would count back from five and ground her if she didn't do the "private stuff." RR 3:59. J.A.P. told Appellant she watched a video of naked "Kardi" drinking milk out of her daddy's "pee-pee" while wearing a leash or chain around her neck. RR 3:60. J.A.P. told Appellant she believes her daddy will do it again. RR 3:61.

11

<u>Testimony of Child Protective Services Investigator</u>

Shirley Flowers (hereinafter, "Flowers") testified she was the CPS investigator assigned to J.A.P.'s case. RR 3:81. As part of her investigation, Flowers interviewed J.A.P., Appellee, and Appellee's wife, Kardigan Pumphrey. RR 3:82; 4:97. Flowers interviewed J.A.P. on January 7, 2025. RR 3:82. J.A.P. told Flowers that when she sleeps in bed with her daddy her daddy has no panties on and she can feel his pee-pee touching her. RR 3:84. J.A.P. told Flowers her daddy touched her "pee-pee" and made her touch his "pee-pee." RR 3:84. Flowers testified, "[J.A.P.] had seen a video of him and his wife doing adult activities where the wife wears an adult leash on - sucking milk from her peepee - from his peepee." RR 3:84. J.A.P. told Flowers that, while she was in the bathroom, her daddy pulled her pants down and asked her to drink milk from his peepee. RR 3:84. Later, during Flowers' direct examination, Flowers testified J.A.P. told her that her daddy made her drink milk from his peepee. RR 3:87. J.A.P. told Flowers she told her daddy she didn't want to do it. RR 3:87. J.A.P. told Flowers R.L.P was present during the events and "Kardi" was outside smoking or asleep. RR 3:82, 88, 99. J.A.P. drew Flowers a picture of J.A.P.'s hand on her daddy's penis. RR 3:82.

Flowers testified she interviewed Kardigan Pumphrey. 3:82; 4:97. Kardigan Pumphrey confirmed the existence of the "dog collar and leash" sex video on hers and her husband's cell phones. RR 3:89, 96. Kardigan Pumphrey confirmed J.A.P.

12

would need the passcode to the phone to be able to see the video and that even if J.A.P. were able to get through the passcode, she would still have to know where to look for the sex video. RR 3:97. Kardigan Pumphrey told Flowers Appellee told her J.A.P. walked in on him masturbating in the bathroom while he was watching the video. RR 3:97. Kardigan Pumphrey told Flowers she travelled with Appellee only when it was financially feasible. RR 3:100.

Flowers testified she interviewed Appellee. 3:82; 4:97. Appellee confirmed the existence of the "dog collar and leash" sex video involving he and his wife. RR 3:89. Appellee told Flowers he may have been watching the video while J.A.P. was laying on the bed. RR 3:89, 95-96. Appellee stated the "dog collar and leash" sex video was on his phone. RR 3:89. Appellee said that, outside of watching the video on the bed, he didn't know how J.A.P. saw it. RR 3:96. Appellee confirmed his phone was password protected. RR 3:96. Appellee told Flowers that Kardigan Pumphrey is with him 99% of the time he travels to Texas to visit J.A.P. and R.L.P. RR 3:100.

The trial court recessed the hearing and continued it to July 2, 2025. RR 3:100-103.

### July 2, 2025 Protective Order Hearing

On July 2, 2025, the Court conducted the continued hearing on Appellant's application for protective order. RR 4:4-120.

13

<u>Testimony of Appellee</u>

Appellee testified he was granted standard possession and access of J.A.P. and R.L.P. after his divorce from Appellant. RR 4:9. Appellee testified he moved to Florida and came to Texas approximately every two weeks to exercise his visitation with J.A.P. and R.L.P. in hotel rooms. RR 4:9, 28-29. Appellee confirmed he stayed at the Sleep Inn hotel in Round Rock and the Comfort Inn hotel in Pflugerville, Texas. RR 4:10. Appellee identified Petitioner's Exhibits 1, 2, and 3 as being an accurate depiction of the hotel room where he stayed with J.A.P. and R.L.P. in 2024. RR 4:13-14.

Appellee confirmed he was in possession of a sex video where Kardigan Pumphrey was giving him oral sex while wearing a dog collar and leash. RR 4:15-16, 21-22. Appellee testified that, after J.A.P. and R.L.P. were asleep, he went into the bathroom to take a shower. RR 4:34. Appellee confirmed he was alone with J.A.P. and R.L.P. in the hotel room. RR 4:34. Appellee testified he was masturbating in the hotel bathroom to the "dog collar and leash" video when J.A.P. opened the door. RR 4:34. Appellee testified he believed J.A.P. must have seen the dog collar and leash video through the reflection in the bathroom mirror. RR 4:23. Appellee admitted he enjoyed engaging in risky sexual behavior. RR 4:26. Appellee testified J.A.P. had grabbed his penis when she was younger but denied any sexual intent or encouragement. RR 4:24. Appellee testified he was arrested on

14

the criminal case related to this protective order application and an emergency protective order was in place for ninety days. RR 4:35-36. Appellee testified that after criminal case was "no-billed," he drove to Texas several times to exercise possession and access of J.A.P. and R.L.P. RR 4:36.

Testimony of Law Enforcement

Detective Limary Cardella (hereinafter, "Cardella") testified she was an Austin Police Department detective assigned to the criminal case. RR 4:58. Cardella interviewed Appellee in January of 2025. RR 4:58-59. Appellee told Cardella he was in good standing with his Appellant. RR 4:59. Appellee told Cardella he was at a hotel room in Round Rock, Texas when J.A.P. walked in on him masturbating while sitting on the toilet watching a sex video of he and his current wife. RR 4:59-60. Appellee told Cardella he believed J.A.P. saw the sex video through the mirror when she came in the bathroom. RR 4:60.

Officer Sean Randolph (hereinafter, "Randolph") testified he was a Round Rock Police Department detective assigned to the criminal case. RR 4:39. Randolph set up the appointment for a forensic interview of J.A.P. with the CAC. RR 4:40. Randolph testified he investigated the hotels where Appellee, J.A.P., and R.L.P. stayed in 2024. RR 4:40-41. Randolph testified Petitioner's Exhibits 1, 2, and 3 were an accurate depiction of the hotel room he inspected. RR 4:42. Randolph testified he was suspicious of Appellee's explanation "[b]ecause where

15

the toilet was placed and where the mirror was located, it was almost impossible. I actually sat down on the toilet myself and played a video on my phone just to see. It was almost impossible for anybody, even a six-year-old small child, to see a video in a phone if you're sitting down on the toilet watching it or seeing it in the mirror." RR 4:43.

Testimony of Sexual Assault Nurse Examiner

Erin Miller (hereinafter, "Miller") testified she was a licensed and certified forensic nurse practitioner employed with the Williamson County Children's Advocacy Center. RR 4:66. Miller testified she performed a medical exam on J.A.P. on January 14, 2025. RR 4:68. Miller testified J.A.P. was in good health and developmentally appropriate. RR 4:68. Miller testified she and J.A.P. were alone during the examination. RR 4:68. J.A.P. told Miller she had seen her dad's "pee-pee," his "private part," before. 4:70. J.A.P said she and her dad were at a hotel and she touched it with her hand. RR 4:70. J.A.P. demonstrated a gripping motion with her hand to explain to Miller how she touched her dad's penis under his clothes. RR 4:70. J.A.P. told Miller her dad's shirt was on, but that he took off his underwear. RR 4:70. J.A.P. told Miller her dad said, "That feels good" when she touched his "pee-pee" with her hand. RR 4:70. J.A.P. said her dad showed her videos of adults and kids doing things with private parts different than what they did. RR 4:70. Miller testified J.A.P. told her about a time she and her dad were in a

16

hotel and he sat down on the toilet with the lid closed, took her pants off, and told her it was a secret and she couldn't tell anyone. RR 4:70. J.A.P. said she told him she didn't want to do that and he said, "okay" and put her pants back on. RR 4:70.

Miller testified J.A.P.'s behavior was consistent with children who have suffered abuse. RR 4:70. Miller testified J.A.P. was very detailed in her answers. Miller testified that J.A.P. requested a piece of paper during the exam and drew pictures as she talked to Miller about what occurred. RR 4:70. J.A.P. told Miller she and her dad were on the bed and drew a picture of the bed. RR 4:70-71 J.A.P. drew Miller a picture of a toilet and demonstrated that the lid was closed. RR 4:71. J.A.P. drew Miller a picture of videos she watched with her dad that depicted adults and children doing things with "private parts." RR 4:71. Miller testified J.A.P.'s demeanor was very matter of fact during the examination and an appropriate demeanor for a six-year-old who is just telling the story of exactly what happened. RR 4:71.

### *Findings*

The trial made a statement that it found the law enforcement and medical witnesses to be credible. RR 4:108.

The trial court determined that "reasonable grounds to believe" should be analogized to "preponderance of the evidence" as the burden standard for a

17

protective order under Tex. Code of Crim. Proc. art. 7B. RR 4:97 (hereinafter, "Chapter 7B").

The trial court denied Appellant's Application for Protective Order and made findings there were no reasonable grounds to believe Appellee committed family violence, dating violence, or child abuse, or one of more of the following offenses against either of the applicants: sexual assault or abuse, indecent assault, indecency with a child, stalking, or trafficking, or any other ground necessary for the granting of a protective order under Tex. Code of Crim. Proc. art. 7B.003. CR 198-201; RR 4:115.

The trial court reasoned that, because the grand jury's no-bill was for the criminal offense of Indecency with a Child, the court could not logically find reasonable grounds to believe the offense of Indecency with a Child occurred by a preponderance of the evidence because the grand jury's burden of probable cause was a lower burden than preponderance of the evidence. RR 4:103-115.

## SUMMARY OF THE ARGUMENT

This appeal arises from the trial court's denial of Appellant's application for a protective order under Tex. Code Crim. Proc. art. 7B (hereinafter, "Chapter 7B").

18

The trial court's denial rests on legal error and denial of due process, an abuse of discretion—and each of which independently requires reversal.

First, the record demonstrates the trial court misapplied Chapter 7B by (a) elevating the statutory "reasonable grounds to believe" standard beyond that required by law, and (b) improperly weighing the existence of a collateral criminal grand jury no-bill in its civil protective order analysis. Chapter 7B establishes a protective framework intended to prevent future harm, not to adjudicate criminal guilt. Nevertheless, the trial court concluded an extra-judicial factfinder's decision not to return a criminal indictment led the trial court to decline to apply it from finding reasonable grounds to believe the offense of Indecency with a Child occurred. That reasoning conflicts with controlling authority recognizing that criminal charging decisions do not govern or preclude civil protective order relief and reflects a fundamental misapplication of the governing statute.

Second, the trial court violated Appellant's right to due process by denying her a meaningful opportunity to present evidence in support of her application before making substantive rulings affecting child safety, possession, and access. The record reflects Appellant repeatedly requested to proceed on the evidentiary merits of her protective order application. The trial court denied or ignored those requests

and instead entered interim rulings and findings, sua sponte, on substantive issues directly affecting the safety of the children.

The record reflects a consistent pattern in which the trial court declined to exercise its statutory responsibility to decide Appellant's application for protective relief on the evidence before it. At the initial hearing—when Appellant appeared pro se—the court advised Appellant the matter should await criminal developments and assured her that delaying a merits determination would not prejudice her request. RR 2:4, 6–11. The same reluctance persisted in subsequent hearings, where the court repeatedly emphasized external considerations, including criminal proceedings and the involvement of an amicus attorney, rather than adjudicating the application under Chapter 7B. RR 3:10–11, 16, 18–19, 23; RR 4:103–115. The trial court's characterization of a lifetime protective order as a "de facto termination" further underscores its resistance to applying the statutory framework as written. RR 3:45–46.

Chapter 7B does not authorize a trial court to defer or outsource its obligation to determine whether reasonable grounds exist. Because the trial court applied the wrong legal standard, denied Appellant a meaningful opportunity to present evidence, and reached a conclusion unsupported by the evidentiary record, the

order denying the application for a protective order should be reversed and the case remanded for further proceedings consistent with Chapter 7B.

## ARGUMENT

### I. THE TRIAL COURT MISAPPLIED CHAPTER 7B BY ELEVATING THE STATUTORY STANDARD AND IMPROPERLY RELYING ON A CRIMINAL GRAND JURY NO-BILL

*Standard of Review and Statutory Framework*

Statutory interpretation presents a question of law reviewed de novo. *Bracey v. City of Killeen*, 417 S.W.3d 94, 103 (Tex. App.—Austin 2013, no pet.). A trial court has no discretion in determining what the law is or in applying the law to the facts; when a court misinterprets or misapplies governing law, it abuses its discretion. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992); *In re Oates*, 104 S.W.3d 571, 575 (Tex. App.—El Paso 2003, no pet.).

Chapter 7B governs applications for protective orders arising from certain criminal offenses, including indecency with a child under Texas Penal Code section 21.11. Tex. Code Crim. Proc. art. 7B.001. The statute requires a trial court to grant a protective order if it determines there are reasonable grounds to believe the respondent committed one of the enumerated offenses. Tex. Code Crim. Proc. art. 7B.003.

21

Chapter 7B protective order proceedings are civil in nature. *Caldwell v. State ex rel. Zimmerman*, No. 03-22-00464-CV, 2024 Tex. App. LEXIS 6208, at *15–16 (Tex. App.—Austin Aug. 23, 2024, pet. denied), cert. denied, 2025 U.S. LEXIS 4101 (2025). Although Chapter 7B authorizes protective relief based on conduct that would qualify as a Penal Code offense, such proceedings are not prosecutions for the underlying offense. *Id.*; see also *Goldstein v. Sabatino*, 690 S.W.3d 287, 291–92 (Tex. 2024). The purpose of a Chapter 7B protective order is not punitive, but protective—designed to prevent future harm to the applicant and members of the applicant's family or household. Tex. Code Crim. Proc. art. 7B.005(a)(1). Accordingly, Chapter 7B requires a trial court to apply the statutory "reasonable grounds to believe" standard—distinct from criminal charging standards—and to grant protective relief when that standard is satisfied.

### *Application to the Record*

The trial court elevated the statutory standard and misapplied Chapter 7B. The record demonstrates the trial court did not apply the statutory "reasonable grounds to believe" standard required by Chapter 7B. Instead, the court repeatedly treated the existence and outcome of a criminal grand jury proceeding as a controlling benchmark, importing a criminal charging framework into a civil protective order determination.

At the June 11, 2025 hearing, the trial court repeatedly referenced the grand jury's no-bill while addressing whether protective relief was appropriate. The trial court asked, "And that was the accusation that was no-billed by the grand jury?" RR 3:10. It then stated, "You're looking at this broader than what was presented with grand jury; is that what you're saying?" RR 3:11. The trial court returned to the same theme by asking, "Was there another charge involving the video that was presented to the grand jury?" RR 3:16. Later, the trial court framed its analysis by stating, "Ok. So, I've got a case that was no-billed by a grand jury… Tell me why I shouldn't allow him to have supervised access?" RR 3:23; RR 4:103–115.

This criminal law lens was evident from the outset. At the January 23, 2025 hearing, the trial court advised Appellant, "So, typically, we let these investigations play out before we proceed with a protective order because one could interfere with the other." RR 2:4. The trial court suggested the matter was "premature to go forward on the merits" based on the county attorney's inaction and repeatedly stated it did not want to "move forward" because doing so could interfere with the criminal investigation. RR 2:6–8. These statements reflect that the trial court conditioned its Chapter 7B analysis on the status of the criminal case rather than determining whether reasonable grounds to believe existed under the statute.

When the matter returned on June 11, 2025, Appellant requested that the trial court proceed on her application for protective relief. RR 3:40. Rather than applying the statutory standard, the court questioned the timing of the request and raised concerns about the consequences of granting protective relief. RR 3:40–41, 45–46. In the same exchange, the court discussed appointing an amicus attorney and characterized Appellant's request for a lifetime protective order as a "de facto termination of parental rights." RR 3:45–46. These considerations also fall outside the statutory framework governing Chapter 7B relief.

From the initial hearing through the July 2, 2025 proceedings, the trial court systematically substituted criminal charging outcomes and collateral considerations for the statutory inquiry mandated by Chapter 7B. By elevating the evidentiary threshold beyond "reasonable grounds to believe" and treating a criminal no-bill as dispositive, the court applied an incorrect legal standard.

A trial court abuses its discretion when it misinterprets or misapplies governing law. *Walker*, 827 S.W.2d at 839. Because the trial court misapplied Chapter 7B, its denial of Appellant's application constitutes an abuse of discretion. The order must therefore be reversed and the cause remanded for application of the correct statutory standard.

24

## II. THE TRIAL COURT VIOLATED APPELLANT'S RIGHT TO DUE PROCESS BY DENYING A MEANINGFUL OPPORTUNITY TO PRESENT EVIDENCE

### *Standard of Review*

Whether a trial court afforded a party due process presents a question of law reviewed de novo. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002); *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014).

### *Applicable Law*

Due process requires, at a minimum, notice and a meaningful opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *In re B.L.D.*, 113 S.W.3d 340, 352 (Tex. 2003).

A trial court violates due process when it prevents a party from presenting evidence material to the issues before the court. *In re J.F.C.*, 96 S.W.3d 256, 274 (Tex. 2002); *In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003).

A litigant must be afforded a fair opportunity to develop and present evidence before the court renders substantive rulings affecting that party's rights. *In re K.M.L.*, 443 S.W.3d at 112.

*Application to the Record*

The record reflects the trial court did not afford Appellant a meaningful opportunity to present evidence in support of her application for protective relief. During Appellant's hearing on January 23, 2025, the trial court discouraged presentation of evidence and declined to reach the merits of the application, advising it did not want to "hear anything today" and that it was "not going to make any decision today either way." RR 2:8–11. The trial court neither granted nor denied Appellant's application, nor did it provide a setting for a merits hearing. RR 3:15.

At Appellant's hearing on June 11, 2025, the trial court announced it had two matters before it concerning Appellant – a motion for further temporary orders on a petition to modify and a protective order application. RR 3:4. Appellant requested that the trial court take up the protective order application first. RR 3:4. The trial court declined to do so because it did not have a physical copy of Appellant's proposed order and stated it would not hear evidence without one; RR 3:4-5, as a result, the trial court proceeded on temporary orders. RR 3:5. During Appellant's opening statement—the trial court made findings concerning evidence not yet offered, determined the number and identity of permissible outcry witnesses, assessed the relevance of law-enforcement testimony, and addressed the grand jury's actions, all before hearing any evidence. RR 3:7–11, 14–16.

The record reflects that throughout the second and third hearings, the trial court continued to defer a merits determination on the protective order while addressing collateral considerations and making substantive rulings affecting the parties and the child. RR 3:18–19, 23, 25–30. When Appellee requested interim visitation, Appellant repeatedly requested permission to present evidence before the trial court ruled on Appellee's request. RR 3:23, 25, 27, 29. Each request Appellant made was denied. RR 3:23, 26, 27, 30.

It is evident from the record that Appellant was not afforded a fair opportunity to develop and present the evidence material to the Chapter 7B application prior to the court ruling that Appellee would have contact with R.L.P. RR 3:23. After the trial Court granted Appellee's request for possession and access with R.L.P., Appellant renewed her request to proceed on her application for protective order. RR 3:40. The trial court continued to resist reaching a merits determination and asked, "Are you sure you want to go forward on this now… the timing seems pretty significant here." RR 3:40. The trial court continued to raise concerns about the timing on Appellant's request and the burden on Appellee of granting Appellant's requested protective relief. RR 3:42-46.

When a trial court's actions prevent the development of the evidentiary record on a claim, the reviewing court cannot assess the effect of the excluded evidence.

*In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003); *In re K.M.L.*, 443 S.W.3d 101, 119 (Tex. 2014). In such circumstances, the denial of the opportunity to present evidence constitutes reversible error. *In re M.S.*, 115 S.W.3d at 549; *In re K.M.L.*, 443 S.W.3d at 119.

Because the trial court denied Appellant a meaningful opportunity to present evidence in support of her application for protective relief before rendering substantive rulings affecting child safety and possession and access, the proceedings failed to comport with due process. *In re B.L.D.*, 113 S.W.3d at 352; *In re J.F.C.*, 96 S.W.3d at 274. Reversal is required.

## REQUESTED RELIEF

Because the trial court applied an incorrect legal standard in denying Appellant's application for protective relief under Chapter 7B and conducted the proceedings in a manner inconsistent with due process, the order denying the application cannot stand. Appellant respectfully requests that this Court reverse the trial court's order denying the application for protective order and remand the cause to the trial court for further proceedings consistent with this Court's opinion and the governing statutory and constitutional requirements.

Appellant requests all further relief to which she may be justly entitled.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully prays that this Court reverse the trial court's order denying Appellant's application for protective order and remand this cause to the trial court for further proceedings consistent with this Court's opinion and applicable law, and for such other and further relief to which Appellant may be justly entitled.

## CERTIFICATE OF SERVICE

I, Lisa Rasmussen Hoing, hereby certify that on this the 1st day of January, 2026, this Original Brief of Appellant was served via ECF to:

Jaynie N. Badgett
Counsel for Appellee-Respondent

GODDARD & HOING, P.C.

By: /s/ Lisa Rasmussen Hoing
Attorney for Appellant-Applicant

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I certify that this Original Appellant's Brief complies with the applicable word limit. According to the word-count function of Microsoft Word, the brief contains 15,000 words, excluding the portions of the brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

GODDARD & HOING, P.C.

By: /s/ Lisa Rasmussen Hoing
Attorney for Appellant-Applicant

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 109590474
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Appellant's Original Brief
Status as of 1/2/2026 7:18 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jaynie Badgett | 24093912 | jaynie@coferconnelly.com | 1/1/2026 4:20:41 PM | NOT SENT |
| Lisa Hoing | | lrh@goddardhoing.com | 1/1/2026 4:20:41 PM | NOT SENT |